## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LASHANDA MICHELLE COOPER      CASE NO. 2:20-CV-12670

       *Plaintiff*,                  HON. GERSHWIN A. DRAIN
*v.*                               DISTRICT JUDGE

COMISSIONER OF SOCIAL       HON. PATRICIA T. MORRIS
SECURITY,                      MAGISTRATE JUDGE

       *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15)

### I.     RECOMMENDATION

Plaintiff Lashanda Michelle Cooper challenges the Commissioner of Social Security regarding a final decision denying her claim for Disability Insurance Benefits ("DIB"). (ECF No. 10, PageID.205.) The case was referred to the undersigned for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 13), **GRANTING** the Commissioner's motion, (ECF No. 15), and affirming the decision.

1

## II.   **REPORT**

### A.  Introduction and Procedural History

Plaintiff's application for DBI was protectively filed on May 14, 2018.  (ECF No. 10, PageID.45.)  She alleged that she became disabled on December 17, 2016.  (*Id*. at PageID.236.)  The Commissioner denied the claim on August 13, 2018. (ECF No. 10, PageID.129.)   Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on November 25, 2019.  (ECF No. 10, PageID.58.)  The ALJ issued a decision on February 21, 2020, finding that Plaintiff was not disabled.  (*Id*. at PageID.42, 52.)   The Appeals Council denied review on August 27, 2020.  (*Id*. at PageID.34.)  Plaintiff sought judicial review on September 30, 2020.  (ECF No. 1.)  The parties filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 13, 15.)

### B.  Standard of Review

The  Court  has  jurisdiction  to  review  the  Commissioner's  final  administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."   *Rogers  v.  Comm'r  of  Soc.  Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 10, PageID.52.)  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 17, 2016. (*Id*. at PageID.47.)  At step two, the ALJ concluded that Plaintiff had the following severe impairments: morbid obesity, degenerative changes in the lumbar spine, and right hand tendinitis.  (*Id*.)  The ALJ found that Plaintiff experienced hypertension and reduced vision as non-severe impairments.  (*Id*. at PageID.47-48.)  None of these impairments met or medically equaled a listed impairment at step three.  (*Id.* at PageID.48.)  Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 416.967(a) except she can lift up to 10 pounds occasionally; never climb ladders, ropes or scaffolds; never crouch or crawl; occasionally climb ramps and stairs, balance, stoop, and kneel; frequent handling and feeling with the dominant right hand; avoid concentrated use of hazardous, moving machinery; avoid all exposure to unprotected heights; and based on physical symptoms, simple, routine tasks, free of fast-paced production requirements with simple, work-related decisions.

(*Id*.)  At step four, the ALJ found that Plaintiff is unable perform any past relevant work. (*Id.* at PageID.50.)  Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including work as an inspector, general office clerk, or assembler.  (*Id.* at PageID.51.)  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id*. at PageID.52.)

### E.  Administrative Record

###### i.      Medical Evidence

A December 3, 2016 medical report from St. Mary Mercy Hospital provides that Plaintiff presented that day with an "episode of tingling sensation and the sudden onset of right lower extremity numbness and sharp pain" and a headache. (ECF No. 10, PageID.379.) An examination of her spine, dated December 5, 2016, shows that while she experienced chronic low back pain, there was only "partial disc desication with minimal height loss[,] small annular disc bulge and mild facet arthropathy" in L4-5 and "very shallow annular disc bulge and mild to moderate hypertrophic facet arthropathy" in L3-4; the other areas showed "no significant disk herniation." (*Id*. at PageID.401.) The overall impression was "unremarkable MRI of the orbits[.]" (*Id*. at PageID.403.) A January 8, 2017 medical report from St. Mary Mercy Hospital noted that Plaintiff presented with complaints of low back pain that radiated to her thigh and knee. (ECF No. 10, PageID.359.) The report noted that Plaintiff was able to ambulate, had no weakness or numbness, and had a normal range of motion and mild tenderness in her back. (*Id*. at PageID.359-60.) Her joint spaces were well-reserved and showed no abnormality in soft tissues. (*Id*. at PageID.361.) She was prescribed Naproxen. (*Id*. at PageID.362.) A February 19, 2017 report from a visit to St. Mary Mercy Hospital notes that Plaintiff presented with complaints of right leg pain and provided that it had been an ongoing problem for a couple of months. The pain was in her right lower back and radiated down her right thigh to her knee. (ECF No. 10, PageID.352.) Plaintiff was prescribed Norco and was discharged. (*Id*. at PageID.354.)

A report from Botsford Hospital dated December 18, 2017 notes that Plaintiff showed "normal range of motion" and "5 out of 5 upper and lower extremity bilaterally including EHL. Normal DTRs. Ambulatory[.]" (*Id*. at PageID.629.) Plaintiff complained of leg pain as a "6/10" on that date. (*Id*. at PageID.632.) A January 28, 2018 report from Botsford hospital noted that Plaintiff was negative for back pain and neck pain. (*Id*. at PageID.683.) Again, on February 6, 2018, when Plaintiff visited the hospital after a slip and fall at a McDonald's, she again was negative for back and neck pain, although positive for arthralgias.[1] (*Id*. at PageID.743.) During this visit it was also noted that her range of motion in her left hip was intact. (*Id*. at PageID.744.) On March 19, 2018, she visited the hospital again complaining of "nontraumatic low back pain for the past week . . . that shoots down her right leg." (*Id*. at PageID.774.) A physical exam concluded "ropy paraspinals and right low back, point tenderness in the right upper buttock. Skin overlying the region is normal in appearance." (*Id*. at PageID.776.) The doctor ultimately concluded "no concerning exam findings at this time, plan for home was discussed[.]" (*Id*. at PageID.777.)

An April 25, 2018 medical report from the Michigan Institute of Neurological Disorders shows that Plaintiff complained of right leg paresthesias [sic] and hand spasms, (*Id*. at PageID.465), and upon examination, showed spine strength "within normal limits" and "no associated cervical radicular symptoms, abnormal movements, or myopathic findings on examination," but noted that her "right leg paresthesias [sic] is consistent with

[1]   Johns   Hopkins   Medicine,   Health,   Arthralgia,   "Arthralgia   describes   joint   stiffness." https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthralgia#:~:text=What%20is%20arthralgia%3F,including%20rheumatic%20fever%20and%20chickenpox (last visited December 7, 2021.)

a lumbar radiculopathy primarily affecting the L4 dermatome." (*Id*. at PageID.468.) Plaintiff was prescribed physical therapy. (*Id*.) A medical report dated May 2, 2018 from the Michigan Institute for Neurological Disorders noted finding "multilevel moderate to severe facet arthropathy from L2-3 through L5-S1 with equivocal spondylolysis of L5" and "no disc herniation or stenosis." (*Id*. at PageID.470.)

A state agency medical examination dated July 31, 2018, (ECF No. 10, PageID.111), by Thomas Flake, M.D. provided that Plaintiff "should be able to at least 2 hours, stand at least 2 hours, walk at least 1 hour, and partially bend at least 40 degrees; avoid frequent bending, squatting, kneeling, and climbing. She can lift at least 20 pounds for 8 hours a day." (*Id*.) Dr. Flake noted complaints of pain in Plaintiff's low back that radiated to her right thigh. (*Id*. at PageID.114.) But the doctor ultimately noted that she had a stable gait, got on and off the table by herself, did not have a limp, and did not have to use a cane. (*Id*.) The report indicated that Plaintiff's "statements about the intensity, persistence, and functionally limited effects of the symptoms" were not substantiated by the objective medical evidence alone. (*Id*. at PageID.117.)

A consultative examination was provided on July 31, 2018 by Bina Shaw, M.D., wherein Dr. Shaw noted that Plaintiff had pain in her low back that radiated to her right thigh, but found that her "c-spine" had full range of motion, shoulders, elbows, wrists, hands, hips, knees, ankles and toes had full range of motion, her bilateral knee "crepitus" was positive with passive range of motion, had no midline spine tenderness, but did note lumbar lordosis due to obesity. (*Id*. at PageID.512.)

On September 28, 2018, Plaintiff presented to Botsford Hospital again complaining of "aching all over." (*Id.* at PageID.808.) The report only notes that an "EKG" was "unremarkable." (*Id.* at PageID.822.)

On May 24, 2019, Plaintiff presented to Botsford Hospital complaining of a "burning sensation and swelling in leg" and a pain score of "10." (*Id.* at PageID.902.) But a physical exam noted "deep tendon reflexes equal[,] no calf tenderness or swelling[,] no midline spine tenderness." (*Id.* at PageID.909.)

A report dated June 19, 2019, by Guillermina Nava, M.D., notes that Plaintiff showed decreased grip strength in her right side compared to her left but had "full range of motion." (*Id.* at PageID.527.) Another report from Dr. Nava, dated April 24, 2019, provides that Plaintiff complained of right hand and forearm pain, but the symptoms were "really not consistent with carpal tunnel syndrome." She had 4/5 grip strength on the right hand and 5/5 on the left. (*Id.* at PageID.557.)

### ii.     Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified at the November 25, 2019 hearing. (ECF No. 10, PageID.64.) The ALJ asked Plaintiff several questions. She was 43 years old on that date, had completed a GED and competed a few years of college, and had lived at an address in Detroit for approximately two months. (*Id.* at PageID.64.) At a prior house she was living at, with her father and younger sister, she had to walk up three stairs on the front porch—this was difficult for Plaintiff because her right leg was "numb all the time." (*Id.* at PageID.67.) She also complained of her knee popping "in and out" and attributed that to degenerative

9

arthritis in her knee. (*Id*.) While she was living with her father and sister, Plaintiff took care of her personal needs including bathing, showering, getting dressed, and using the bathroom, although her sister had to help her pull on her pants due to her right leg being numb. (*Id*. at PageID.69.) She did not cook, clean, do laundry, or shop for groceries while living with her family. (*Id*. at PageID.69-70.)

After she moved to Detroit, she was only living with her son, who was 26 at that time. (*Id*. at PageID.70.) She did not do any cooking and her son did most of the yard work and grocery shopping, although she sometimes accompanied him to the grocery store. (*Id*. at PageID.71.) If she went to the store, she rode one of the provided electric mobile chairs. (*Id*.) Her son also did their laundry. (*Id*. at PageID.72.)

The ALJ asked Plaintiff about her work history. (*Id*. at PageID.76.) From 2004-05, she was self-employed, and made vases and baskets out of her home. (*Id*.) In that role she spent her time equally seated and standing and had to lift up to twenty pounds. (*Id*.) In 2008 she worked at McDonald's and eventually became a manager there. (*Id*. at PageID.76-77.) In that role she was on her feet all day and had to lift up to thirty pounds. (*Id*. at PageID.77.) She last worked there in 2011. (*Id*. at PageID.77.)

After she stopped working as a cook in 2016, Plaintiff tried to take on a "driving" job but couldn't drive long distances because her leg went numb while driving. (*Id*. at PageID.78.) She could not drive longer than fifteen minutes. (*Id*.)

Plaintiff testified that she last worked in December 2016. (*Id*. at PageID.73.) She worked at the University of Michigan in the "South Quad Dorm" as a cook. (*Id*.) She stopped working when, one day, her knee "popped" for the first time and she could not

move the next day. (*Id.*) In her position as a cook, Plaintiff was on her feet all day, and had to lift between thirty-five- and forty-five-pound boxes. (*Id.* at PageID.74.)

When asked what the main condition was that kept her from working full-time, Plaintiff responded it was the "sciatic nerve damage [] causing my right-sided paralysis. So, the main thing is the burning sensation and then like someone actually taking a knife to my thigh." (*Id.* at PageID.79.) Plaintiff testified that she experienced this pain every day without medication, and with medication, for about half the day. (*Id.*) Plaintiff took Norco three times a day for pain, and she provided that the side effects from that drug included the inability to drive, "work a machine," and drowsiness. (*Id.* at PageID.80.) She took Lyrica for her nerve pain which only caused "some drowsiness, but it really attack[ed] the nerve damage." (*Id.* at PageID.80-81.) Plaintiff agreed that the Lyrica did a better job of reducing pain than other medications she had tried. (*Id.* at PageID.81.) From when her nerve pain began in 2016 until the hearing, she was without medication for only about six months, and she agreed that she did "better with the Lyrica than without anything." (*Id.* at PageID.82.) She was also prescribed Motrin 800 and Biofreeze and used a heating pad for the pain. (*Id.* at PageID.84.)

Plaintiff testified that she slept for about three hours during the day because she could not sleep at night. (*Id.* at PageID.85.) Plaintiff's pain management doctor, a doctor from Providence Hospital, recommended a back surgery to Plaintiff, but she declined to do the surgery because she was "terrified" of the side effects. (*Id.*) Another doctor, Dr. Nava, recommended that Plaintiff have surgery on her hand. (*Id.* at PageID.86.) Plaintiff explained that she was diagnosed with carpal tunnel and had "tendinitis in the elbow." (*Id.*)

11

Plaintiff complained that her hand would "lock up to where I can't do anything . . . I can't grip anything, I drop things." (*Id*. at PageID.87.) She did not take any medications for these ailments. (*Id*. at PageID.87.) Plaintiff testified that she was able to take care of her own personal needs, including bathing, showering, getting dressed, and using the bathroom, but noted that her sister did her hair for her. (*Id*. at PageID.88.) She had a driver's license and was able to drive "small distances" of about ten minutes. (*Id*. at PageID.89.) Plaintiff testified that that year of the hearing, in 2019, she went on a trip to South Carolina via airplane and attended her mother's funeral. She testified that she did "terrible" on the trip and her pain was similar to it was at home. (*Id*. at PageID.90-91.)

As far as her hobbies, Plaintiff testified that she used to enjoy making baskets, but stopped about one year prior due to pain in her right hand. (*Id*. at PageID.91.) She did not go anywhere in the community such as the bank, library, a park, religious services, out to eat, to the movies, or to visit with family or friends—she described herself as a "loner." (*Id*. at PageID.91-92.)

The ALJ asked Plaintiff if she had difficulty sitting or standing. Plaintiff testified that without her back brace, she could sit for about fifteen minutes, but with her back brace, she could sit for about twenty to thirty minutes. (*Id*. at PageID.92.) Plaintiff stated that she wore her back brace most of the day, including when she is home watching television, and provided that the brace was prescribed by a doctor. (*Id*.) If she stays seated for too long her back "locks up." (*Id*. at PageID.93.) If she stands for too long, about the same amount of time and sitting, she gets a burning sensation from her middle spine to her lower back. (*Id*.) She stated that she could only walk for two or three minutes before having to stop because

of shortness of breath. (*Id.* at PageID.94.) Plaintiff used a cane that she said was prescribed. (*Id.*) Plaintiff testified that the most weight she could lift and carry was a twenty-four ounce "can of baked beans." (*Id.* at PageID.95.) With two hands, Plaintiff could lift about five pounds. (*Id.* at PageID.95-96.) However, she clarified that she could lift a gallon of milk with her left hand, which was her stronger hand. (*Id.* at PageID.96.) She further noted that she does not have full sensation in her right hand and had numbness in her fingers. (*Id.* at PageID.97.)

The ALJ asked Plaintiff about her memory and attention span. (*Id.* at PageID.97.) She said that her memory was "pretty good" and that she can keep her attention focused on something like a television show for about twenty or thirty minutes before she loses focus. (*Id.* at PageID.97.)

### iii.   The Vocational Expert's Testimony at the Administrative Hearing

Next the ALJ questioned the vocational expert ("VE"). (*Id.* at PageID.99.) The VE classified Plaintiff's past work as gift wrapper, Dictionary of Occupational Title ("DOT") code 299.364-014, semi-skilled, SVP 3, light work performed as light; fast food restaurant manager, DOT code 185.137-010, skilled, SVP 5, light work performed up to medium; and cook, DOT code 313.381-030, skilled, SVP 6, medium work performed as medium. (*Id.* at PageID.101.)

The ALJ posed the following hypothetical individual, with the same age, education and work experience as Plaintiff, who:

> Is able to lift up to 20 pounds occasionally, lift or carry up to ten pounds frequently, perform light work as defined by the Regulations, no climbing

13

ladders, ropes or scaffolds, occasionally climb ramps or stairs, occasionally balance, stoop, no crouching, occasional kneeling, no crawling. Occasional handling and feeling objects with the right upper extremity, which is . . . the dominant upper extremity. Avoid all concentrated use of hazardous machinery, avoid all exposure to unprotected heights. Based on physical symptoms, is limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions.

(*Id*. at PageID.101-02.) The ALJ asked whether such an individual would be able to do any of Plaintiff's past work. (*Id*. at PageID.102.) The VE responded that such an individual would not. (*Id*.) When asked whether there would be other jobs in the national economy such an individual could perform, the VE responded that such an individual could perform the following jobs: machine tender, DOT code 569.686-046, 75,000 jobs; line attendant, DOT code 524.687-022, 45,000 jobs; and counter clerk, DOT code 249.366-010, 35,000 jobs. (*Id*.)

Next, the ALJ asked the VE to assume a hypothetical individual with the same limitations as before, but who also was limited to "lift[ing] up to ten pounds occasionally in sedentary work as defined by the Regulations." (*Id*. at PageID.103.) The VE stated that this individual would also not be able to perform Plaintiff's past work and provided that "with the occasional handling at the sedentary level, there would not be competitive employment the individual could perform." (*Id*.) The ALJ asked whether changing the exertional level to "frequent" would make a difference—the VE responded that it would, stating that such an induvial, who could use frequent handling, could perform jobs such as inspector, DOT code 739.687-182, 80,000 jobs; general office clerk, DOT code 209.587-

14

010, 72,000 jobs; or assembler, DOT code 739.687-066, 85,000 jobs. (*Id*. at PageID.103-04.)

The ALJ then suggested "that first hypothetical at the light level. Let's keep all those limitations intact, but add the following limitations to those. Let's say they can stand and walk one and three-quarter hours in an eight-hour workday and sit for six hours[.]" (*Id*. at PageID.104.) The ALJ asked whether any jobs would be available for such an individual. (*Id*.)  The VE testified there would be no jobs available. (*Id*.) The ALJ asked gain about the original hypothetical individual, with the same limitations, but who would be off task more than 20 percent of an eight-hour workday. (*Id*.) The VE testified that such an individual would be precluded from all competitive work. (*Id*.) The VE provided that the maximum amount of time an individual could be off work and maintain full-time employment would be up to fifteen percent of the workday in addition to breaks. (*Id*.)

The VE testified that the generally tolerated amount of absenteeism by employers is "one day or less than one day in a month's time. Employers typically provide two scheduled breaks of ten to [fifteen] minutes each through the day and at lunch and dinner break of approximately [thirty] minutes." (*Id*. at PageID.105.)

Finally, the VE confirmed that her testimony was consistent with the DOT but noted that the DOT did not address "breaks, scheduled or unscheduled absenteeism, being on or off task less than an eight-hour workday." (*Id*.) "[The DOT] also [does] not specifically address the specific description of production rate work and simple decision-making. [The DOT does] not differentiate between left or right extremities or dominant extremities."

(*Id*.) In testifying as to those areas undefined by the DOT, the VE noted that she relied on her "special knowledge and experience." (*Id*.)

Plaintiff's attorney then asked Plaintiff some questions. (*Id*. at PageID.106.) Counsel asked the VE whether the use of narcotic medications would limit or restrict the use of machinery of any sort. (*Id*.) The VE responded that "[t]he [ALJ]'s hypothetical did limit exposure to hazardous machinery, open machinery. But, if it's any machinery, then I definitely would eliminate machine tender. But, the line attendant and counter clerk at the sedentary jobs would remain." (*Id*. at PageID.106-07.) Counsel asked, with respect to the counter clerk job, "if the claimant has numbness in her dominant hand to the extent that she couldn't grasp or grip small items, would that affect job availability?" (*Id*. at PageID.107.) The ALJ interjected and added, before the VE could answer, "[w]ell, I know my hypos, my first one was occasional and [the VE] said no jobs at the sedentary level. Then, I changed it to frequent and she gave me jobs. But I did ask originally about occasional." (*Id*.) Counsel responded, "[t]hat's good enough then." (*Id*.)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

   (i)     A licensed or certified psychologist at the independent practice level; or

   (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an

individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)  Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)  Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)  Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)  Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)  Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area

of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single

analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about

whether you are disabled or blind under our rules." *Id.* § 404.1504.   Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.*   The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).   Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*   Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.   "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]"  *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."  *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will

carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)     The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)     Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a).  Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

**G. Arguments and Analysis**

### i.  The VE's testimony

Plaintiff argues that the ALJ's RFC was not supported by substantial evidence; but Plaintiff relies only on the VE's testimony in support of this assertion. Plaintiff argues, "the [VE]'s testimony clearly stated that there would be no jobs available given Plaintiff's

restrictions due to her physical disabilities. There are no grounds for the [ALJ] to disregard the expert's opinion and testimony." (ECF No. 13, PageID.954.)

I first note that the VE did provide jobs that would be available to a hypothetical individual with the limitations imposed by the ALJ in the ultimate RFC. The VE testified that an individual with the following limitations would be eligible for jobs in significant numbers in the national economy: lift or carry up to ten pounds occasionally, perform sedentary work as defined by the regulations, no climbing ladders, ropes or scaffolds, occasionally climb ramps or stairs, occasionally balance, stoop, no crouching, occasional kneeling, no crawling, *frequent handling and feeling objects with the right upper extremity*, avoid all concentrated use of hazardous machinery, avoid all exposure to unprotected heights, is limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions. (ECF No. 10, PageID.101, 103) (emphasis added.) The VE testified that this individual could work as an inspector, a general office clerk, or an assembler. (*Id*. at PageID.103-04.) And the RFC provides for these exact limitations. (*Id*. at PageID.48.) Thus, the ALJ did not completely disregard the VE or some testimony that Plaintiff would not have any jobs available to her if the ALJ chose such an RFC.

Plaintiff essentially argues that the ALJ should have adopted an even more restrictive RFC with limitations such as only occasional handling with the dominant hand, a limitation which the VE testified would preclude Plaintiff from work. Plaintiff specifically points to only one limitation with which she takes issue—that the ALJ changed

the "hypothetical individual's" ability to "frequently, as opposed to occasionally, use dominant hand although the record does not support this ability with respect to Plaintiff." (ECF No. 13, PageID.952.) This argument is, in essence, a challenge that the RFC was not restrictive enough, and that had the ALJ adopted the more restrictive limitations, Plaintiff would have been precluded from work per the VE testimony.

In response, Defendant argues that the RFC was supported by substantial evidence such as medical opinion evidence, treatment records, and diagnostic evidence, and further argues that "by failing to specify which limitations should have been included and by further failing to point to medical or non-medical evidence supporting such limitations, plaintiff has failed to develop her argument in a manner justifying remand." (ECF No. 15, PageID.966, 967-68.)

Indeed, "substantial evidence" means to "more than a scintilla of evidence but less than a preponderance." *Rogers*, 486 F.3d at 241 (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. 1148, 1154 (2019). The ALJ can, and did in this case, consider more than just the testimony of the VE in the search for substantial evidence.

I disagree with Plaintiff's argument. While the ALJ did not adopt the most restrictive RFC possible, the RFC did include several restrictions—including frequent handling and feeling with the dominant right hand. (ECF No. 10, PageID.48.) Plaintiff specifically points to only one limitation with which she takes issue—that the ALJ changed

the "hypothetical individual's" ability to "frequently, as opposed to occasionally, use dominant hand although the record does not support this ability with respect to Plaintiff." (ECF No. 13, PageID.952.) I suggest that in support of this limitation, and the others, the ALJ properly relied on several points in the medical record. For instance, and as to the frequent handling limitation specifically, the ALJ noted that, regarding the state agency examination and the consultative examination, "these opinions do not address the tendinitis. It warrants at most frequent handling and feeling with the dominant right hand." (*Id.* at PageID.49.) Later, the ALJ provides "[t]he claimant's testimony is also inconsistent with the medical evidence and not suggestive of disability or additional limitations above. She testified to very limited lifting ability alleging she cannot lift even a gallon of milk, but there is no evidence of any left upper extremity impairments, and her physical exams have shown intact strength. This suggests greater ability than the testimony, and inconsistency suggest exaggeration." (*Id.* at PageID.50.) Indeed, my own review of the record medical evidence revealed that at recently as April 24, 2019, a medical report provided that Plaintiff complained of right hand and forearm pain, but the symptoms were "really not consistent with carpal tunnel syndrome." She had 4/5 grip strength on the right hand and 5/5 on the left. (*Id.* at PageID.557.) More generally, the ALJ also refers to the record medical evidence, noting that Plaintiff had "no treatment" for muscle spasms or degenerative disc disease, and also that several neurological evaluations came back as "unremarkable." (*Id.* at PageID.49.)

The ALJ properly considered the opinions of the experts as well as the testimony of Plaintiff and the evidence in the record. The ALJ discussed and analyzed Plaintiff's ability to use her hand and did provide frequent use as a limitation in the RFC, although it was not as strict of a limitation as Plaintiff would have liked. Because the ALJ found, based on the medical evidence, that frequent use of her hand was justified as opposed to the occasional use, the jobs outlined by the VE as available to someone who could frequently use their hand were properly considered in the ALJ's opinion. I suggest the ALJ relied on substantial evidence, including medical opinions and medical records, to support the RFC, even in light of the testimony by the VE. For these reasons, I recommend finding that the ALJ's findings were supported by substantial evidence.

### H. Conclusion

For the previously discussed reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 13), **GRANTING** Defendant's motion, (ECF No. 15), and affirming the decision.

### III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: December 14, 2021

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge